# EXHIBIT A

240737092

**FILE BY FAX**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>David M. Berger (SBN 277526)<br>Gibbs Law Group LLP<br>505 14th Street, Suite 1110, Oakland, California 94612<br><br>TELEPHONE NO: (510) 350-9700    FAX NO.: (510) 350-9701<br>ATTORNEY FOR *(Name):* Roney Miranda and Alain Michael | **FOR COURT USE ONLY**<br><br>**F I L E D**<br>ALAMEDA COUNTY<br><br>SEP 17 2021<br><br>CLERK OF THE SUPERIOR COURT<br>By _____ Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, California 94612
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
Roney Miranda, et. al. v. Capital One Financial Corporation, et. al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| ☑ Unlimited<br>(Amount demanded exceeds $25,000) | ☐ Limited<br>(Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | RG21113096<br><br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation**<br>**(Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property** | ☐ Other collections (09) | ☐ Mass tort (40) |
| **Damage/Wrongful Death) Tort** | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Asbestos (04) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Product liability (24) | **Real Property** | ☐ Insurance coverage claims arising from the |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | above listed provisionally complex case |
| ☐ Other PI/PD/WD (23) | condemnation (14) | types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☑ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel   e. ☑ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve      in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☑ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* 9
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 17, 2021

David M. Berger
(TYPE OR PRINT NAME)                                                  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |

American LegalNet, Inc.
www.FormsWorkflow.com

 

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (*not unlawful detainer or wrongful eviction*)
Contract/Warranty Breach–Seller
Plaintiff (*not fraud or negligence*)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage (*not provisionally complex*) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(*arising from provisionally complex case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment (*non-domestic relations*)
Sister State Judgment
Administrative Agency Award
(*not unpaid taxes*)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
Declaratory Relief Only
Injunctive Relief Only (*non-harassment*)
Mechanics Lien
Other Commercial Complaint
Case (*non-tort/non-complex*)
Other Civil Complaint
(*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (*not specified above*) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

F. ADDENDUM TO CIVIL CASE COVER SHEET           *Unified Rules of the Superior Court of California, County of Alameda*

| Short Title: | Case Number: |
|---|---|
| Miranda, et al. v. Capital One Corporation, et. al. | |

### CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[X] Oakland, Rene C. Davidson Alameda County Courthouse  (446)     [  ] Hayward Hall of Justice  (447)
                                                                   [  ] Pleasanton, Gale-Schenone Hall of Justice  (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | **Is this an uninsured motorist case?  [  ] yes  [  ] no** | | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (<u>not</u> asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [X] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial    **Is the deft. in possession** |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential    **of the property?** |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs    **[ ] Yes   [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | **Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [ ] Yes  [ ] No** | | |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

240737091

Eric Gibbs (SBN 178658)
David M. Berger (SBN 277526)
Jeffrey Kosbie (SBN 305424)
Tayler Walters (SBN 335121)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
dmb@classlawgroup.com
jbk@classlawgroup.com
tlw@classlawgroup.com

*Attorneys for Plaintiffs*

FILE BY FAX

F I L E D
ALAMEDA COUNTY

SEP 1 7 2021

CLERK OF THE SUPERIOR COURT
By _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| RONEY MIRANDA and ALAIN MICHAEL, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CAPITAL ONE FINANCIAL CORPORATION; CAPITAL ONE BANK (USA), N.A.; CAPITAL ONE, N.A.; AMAZON.COM, INC.; and AMAZON WEB SERVICES, INC., <br><br> Defendants. | CASE NO.: **RG21113096** <br><br> Class Action Complaint for: <br><br> 1. **Negligence** <br> 2. **Negligence *Per Se*** <br> 3. **Unjust Enrichment** <br> 4. **Declaratory Judgment** <br> 5. **Breach of Confidence** <br> 6. **Breach of Contract** <br> 7. **Breach of Implied Contract** <br> 8. **Violations of Business and Professions Code § 17200, et seq.** <br> 9. **Violation of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.** |

## CLASS ACTION COMPLAINT

Plaintiffs Roney Miranda and Alain Michael, individually and on behalf of the class defined below, allege the following against Defendants Capital One Financial Corporation, Capital One Bank (USA) N.A., and Capital One, N.A. (collectively, the "Capital One Defendants" or "Capital One"), and against Amazon.com, Inc. and Amazon Web Services, Inc. (collectively, the "Amazon Defendants" or "Amazon"), based upon personal knowledge with respect to themselves and as to all other matters on information and belief derived from, among other things,

1
CLASS ACTION COMPLAINT

1    investigation of counsel and review of public documents.

2    <center>**INTRODUCTION**</center>

3        1.      On July 29, 2019, Capital One, one of the largest banks and credit card issuers in the

4    United States, announced it had experienced a data breach (the "Data Breach") that affected nearly

5    100 million people in the United States and six million people in Canada—primarily people who

6    applied for Capital One credit card products between 2005 and 2019.[1]

7        2.      The Data Breach involved a treasure trove of information for fraudsters and identity

8    thieves. According to Capital One, the Data Breach revealed affected individuals' names, addresses,

9    zip codes, phone numbers, email addresses, dates of birth, self-reported income, credit scores, credit

10    card limits, credit card balances, credit card payment history and limited transaction data, and even

11    Social Security numbers for approximately 140,000 individuals and bank account numbers for

12    approximately 80,000 individuals (collectively, "PII").

13        3.      The Capital One and Amazon Defendants failed to adequately protect the PII that

14    Plaintiffs and class members entrusted to them. Instead, Defendants stored Plaintiffs' and class

15    members' PII in an Amazon Web Services ("AWS") environment that was so insecure a former

16    Amazon employee named Paige Thompson ("Thompson") was able to surreptitiously access and

17    view the PII, remove it from the AWS environment, and make the method for doing so available to

18    the public without Defendants even noticing.

19        4.      When it came to protecting Plaintiffs' and class members' PII, Defendants were

20    asleep at the wheel. Each Defendant was well aware of the security vulnerabilities that Thompson

21    used to access Defendants' systems, but failed to fix them. They ignored the telltale signs of

22    Thompson's hacking into their computer systems. And for months, they looked the other way while

23    Thompson publicly discussed the breach on Twitter and other social media sites.[2]

24        5.      Defendants have no excuse for failing to prevent such well-known vulnerabilities

25    and foreseeable attack. Defendants were fully aware of the perils of a data breach and their legal

26

---

27    [1] Capital One Form 8-K (July 29, 2019) ("July 29 Form 8-K"), https://sec.report/Document/0000927628-19-000262/.

28    [2] Krebs on Security, *Capital One Data Theft Impacts 106M People* (July 30, 2019), https://krebsonsecurity.com/2019/07/capital-one-data-theft-impacts-106m-people/.

<center>2</center>
<center>CLASS ACTION COMPLAINT</center>

1  responsibility to protect the PII in their custody, particularly given the numerous, well-publicized

2  data breaches of major U.S. corporations and financial institutions. Capital One, for example, even

3  publicly acknowledged that "[s]afeguarding our customers' information is essential to our mission

4  as a financial institution."[3] And the Data Breach was so easily preventable that Capital One claimed

5  it was able to "immediately address[] the configuration vulnerability" once it finally acknowledged

6  the Data Breach.[4]

7        6.    Defendants' response, however, came too little too late for the millions of

8  Californians whose privacy has been compromised and who now must contend with the loss of

9  their valuable data and the actual and imminent risk of identity theft and fraud.

10  **<u>JURISDICTION AND VENUE</u>**

11        7.    This Court has subject matter jurisdiction over this entire action because the

12  aggregate claims of Plaintiffs and the class members, exclusive of interest and costs, exceed the

13  $25,000 jurisdictional minimum. Plaintiffs are citizens and residents of California who were injured

14  in California by Defendants' acts and omissions. Defendants each regularly conduct business in

15  California and acts and omissions complained of in this action took place in the State of California.

16  Moreover, Defendants have consistently maintained that federal courts lack jurisdiction over this

17  action. There is no federal question at issue as the claims herein are based solely on California law,

18  and each Defendant has taken the position in federal court after completion of discovery that federal

19  courts lack Article III jurisdiction over claims that are substantively identical to those asserted here.

20        8.    The Court has personal jurisdiction over Defendants because a substantial portion

21  of the wrongdoing alleged by Plaintiffs occurred in the State of California and this County.

22  Defendants conduct substantial business in the State of California and this County. All Defendants

23  have sufficient minimum contacts with and/or otherwise intentionally avail themselves of the

24  markets in the State of California and this County, and have sufficient contacts with the State of

25  California and this County such that it is fair and just for Defendants to adjudicate this dispute here

26  in this County in the State of California.

27

28  [3] July 29 Form 8-K.
   [4] *Id.*

9.      Venue is proper in this Court, including under California Code of Civil Procedure § 395, *et seq.*, because (a) Plaintiffs' injuries occurred in Alameda County, (b) Defendants conduct business in Alameda County, (c) this is a class action, and the acts and/or omissions complained of took place, in whole or in part, within Alameda County, and (d) a significant number of class members reside in Alameda County.

## DEFENDANTS

10.      Defendant Capital One Financial Corporation is a bank holding company that specializes in credit cards, auto loans, and banking and savings accounts. It is headquartered in McLean, Virginia, and incorporated under the laws of the State of Delaware.

11.      Defendant Capital One, N.A. is a national bank with its principal place of business in McLean, Virginia. Defendant Capital One, N.A. is a wholly-owned subsidiary of Capital One Financial Corporation.

12.      Defendant Capital One Bank (USA), N.A. is a national bank with its principal place of business in McLean, Virginia. Defendant Capital One Bank (USA), N.A. is a wholly-owned subsidiary of Capital One Financial Corporation.

13.      The Capital One Defendants, at all relevant times, have conducted business in California, intentionally availed themselves of the markets in the State of California, and serve millions of California applicants and customers, including Plaintiffs.

14.      Defendant Amazon.com, Inc. is a corporation with its headquarters and principal place of business in Seattle, Washington, and incorporated under the laws of the State of Delaware.

15.      Defendant Amazon Web Services, Inc. is a corporation with its headquarters and principal place of business in Seattle, Washington, and incorporated under the laws of the State of Delaware. Amazon Web Services, Inc. is a subsidiary of Amazon.com, Inc.

16.      The Amazon Defendants, at all relevant times, have conducted business in California, intentionally availed themselves of the markets in the State of California, and store personal information of millions of California consumers, including Plaintiffs.

**PLAINTIFFS**

17.     Plaintiffs are individuals who, upon information and belief, had their PII compromised in the Data Breach, and bring this action on behalf of themselves and all similarly situated California citizens. Because Defendants have exclusive knowledge of what information was compromised for each individual, Plaintiffs reserve their right to supplement their allegations with additional facts and injuries as they are discovered.

18.     Plaintiffs place significant value in the security of their PII. Plaintiffs entrusted their sensitive PII to Defendants with the understanding, based on Defendants' statements and representations, that Defendants would keep their information secure and employ reasonable and adequate security measures to ensure that it would not be compromised. If Plaintiffs had known of Defendants' lax security practices with respect to Plaintiffs' PII, they would not have done business with Capital One, would not have applied for Capital One credit cards, would not have opened, used, or continued to use Capital One credit cards or banking services at the applicable interest rates and on the applicable terms, or would have paid less because of the diminished value of Capital One's services.

19.     Plaintiffs' PII remains at risk because Defendants continue to store and use that data in a manner that unreasonably exposes it to targeting by malicious third parties for identity theft, fraud, and misuse.

20.     Plaintiff Roney Miranda is a resident and citizen of Oakland, California. Prior to the Data Breach, Miranda applied for and used a Capital One credit card and provided his PII to Capital One in order to do so. In 2019, Miranda received a notice of the Data Breach from Capital One. Capital One stated in the notice that the hackers may have obtained his: name, Social Security number, address, zip code/postal code, phone number, email address, date of birth, self-reported income, credit card customer data including customer status data (for example, credit scores, credit limits, balances, payment history and contact information) and fragments of transactional data from 23 days during 2016, 2017, and 2018. Further, as a result of the Data Breach, Miranda spent time and effort monitoring his accounts to detect fraudulent activity in order to mitigate against potential harm. If Miranda had known that Capital One's data security measures were inadequate to

1   safeguard customers' PII from theft, he would not have applied for or used Capital One credit cards

2   or provided his PII. Given the highly-sensitive nature of the information stolen, Miranda remains

3   at a substantial and imminent risk of future harm.

4         21.    Plaintiff Alain Michael is a resident and citizen of Camarillo, California. Prior to the

5   Data Breach, Michael applied for and used a Capital One credit card and provided his PII to Capital

6   One in order to do so. In 2019, Michael received a notice of the Data Breach from Capital One.

7   Capital One stated in the notice that the hackers may have obtained his: name, Social Security

8   number, address, zip code/postal code, phone number, email address, date of birth, self-reported

9   income, credit card customer data including customer status data (for example, credit scores, credit

10   limits, balances, payment history and contact information) and fragments of transactional data from

11   23 days during 2016, 2017 and 2018. Since the Data Breach, Michael has had multiple instances of

12   credit card compromise. Further, as a result of the Data Breach, Michael spent time and effort

13   monitoring his accounts to detect fraudulent activity in order to mitigate against potential harm. If

14   Michael had known that Capital One's data security measures were inadequate to safeguard

15   customers' PII from theft, he would not have applied for or used Capital One credit cards or

16   provided his PII. Given the highly-sensitive nature of the information stolen, Michael remains at a

17   substantial and imminent risk of future harm.

18   **FACTUAL ALLEGATIONS**

19   **"We're building a technology company that does banking."**
20   Richard D. Fairbank - Chairman, CEO and President of Capital One, February 20, 2019

21   **A.    Capital One's Collection and Use of Customer Data**

22         22.    Capital One is one of the largest banks and credit card issuers in the United States.

23   In 2018 it recorded over $28 billion in revenues and had $107.35 billion in credit card loans

24   outstanding in the United States, with credit cards representing 47.3% of total loans outstanding. In

25   addition to credit card loans, Capital One offers banking services, including checking accounts,

26   saving accounts, and money market accounts as well as retail and auto loans. As of December 31,

27

28

1   2018, the company had $2.864 billion in retail loans outstanding and $56.341 billion in auto finance

2   loans outstanding, representing 24.1% of total loans outstanding.[5]

3         23.   Capital One routinely collects PII from consumers and small businesses applying

4   for its credit. Applicants are asked for name, date of birth, social security number, address, phone

5   number, annual income, mortgage information, bank account information, and other personal

6   financial information. The PII collected by Capital One is not simply used to process a card or loan

7   application, but is also used to determine credit limits, interest rates, fees, and other terms of credit.

8         24.   In addition to this customary use of PII to make credit decisions, Capital One

9   maintains and mines the data for purposes of product development, targeted solicitation for new

10  products, and target marketing of new partners—all in an effort to boost its profits.

11        25.   From its beginning, Capital One adopted this "Information Based Strategy," or IBS,

12  to obtain a competitive advantage. In its very first Form 10-K in 1996, Capital One explained:

13              The Company's IBS is designed to allow the Company to differentiate
                among customers based on credit risk, usage and other characteristics and
14              to match customer characteristics with appropriate product offerings. IBS
                involves developing sophisticated models, information systems, well-
15              trained personnel and a flexible culture to create credit card or other
                products and services that address the demands of changing consumer and
16              competitive markets. By using sophisticated statistical modeling
                techniques, the Company is able to segment its potential customer lists
17              based upon the integrated use of credit scores, demographics, customer
                behavioral characteristics and other criteria. By actively testing a wide
18              variety of product and service features, marketing channels and other
                aspects of its offerings, the Company can design and target customized
19              solicitations at various customer segments, thereby enhancing customer
                response levels and maximizing returns on investment within given
20              underwriting parameters.[6]

21        26.   In its 2018 Annual Report, Capital One recalled its 25-year history of using

22  technology to advance its business:

23              Capital One Was the Original "FinTech." It didn't come easy at first. We
                had more passion than customers and more belief than believers. The term
24              didn't exist yet, but in the early days of Capital One, we were a FinTech.
                For a while it was unclear if our little company would get a chance to make
25              a big impact. We were a start-up: recruiting talent, building modern
                technology from scratch, conducting tests, and incubating results. And all

26

27  _____

    [5] Capital One 2018 Annual Report, at 3, 78, available at https://ir-capitalone.gcs-web.com/static-
    files/04c57bd9-b351-418c-9f18-ed91d4bfad23.

28  [6]   Capital   One   Financial   Corporation,   1996   Form   10-K,   available   at
    http://getfilings.com/o0000950133-97-001012.html.

along the way, we worked to keep the dream alive. While the initial idea came quickly, it took five lonely years until we had our first success. Against all odds, it finally worked, and we haven't looked back. We built one of the nation's largest credit card businesses and then did the same thing in auto finance and small business cards.[7]

27.     As technology improved throughout the 1990's and 2000's, Capital One's Information Based Strategy moved to a digitally based system. For example, Capital One's 2011 Form 10-K stated that Capital One "leverage[s] information technology to achieve our business objectives and to develop and deliver products and services that satisfy our customers' needs [a key aspect of which is] the development of efficient, flexible computer and operational systems to support complex marketing and account management strategies and the development of new and diversified products."[8] This strategy also prompted Capital One to utilize artificial intelligence to analyze customer data, which would require Capital One to collect, store, and mine customer data on an unprecedented scale.

28.     Machine learning is an application of artificial intelligence through which computer algorithms are given raw data and "learn" on their own to discern patterns and accomplish tasks. As an example, in the financial services industry, machine learning is used to detect unauthorized use of a credit card by analyzing customer data to discern patterns suggestive of unauthorized transactions. Artificial intelligence programs can detect patterns in data that are difficult for humans to perceive.

29.     Machine learning requires data. There is a direct correlation between the amount of data provided to the machine learning algorithm and the effectiveness of the machine learning algorithm.[9] Thus, the more data made available to these artificial intelligence programs, the more accurate and useful the programs will be.

30.     To store, process, and mine sensitive customer data, banks like Capital One traditionally use a dedicated-server or private-cloud solution for their storage and processing needs.

---

[7] Capital One 2018 Annual Report, at 3.
[8]     Capital   One   Financial   Corporation,   2011   Form   10-K,   available   at http://investor.capitalone.com/static-files/9982f071-158b-4ecd-9a42-77200b9d2442.
[9] *See* William Sundblad, *Data is the Foundation For Artificial Intelligence and Machine Learning*, FORBES   (Oct.   18,   2018),   available   at https://www.forbes.com/sites/willemsundbladeurope/2018/10/18/data-is-the-foundation-for-artificial-intelligence-and-machine-learning/#45c9c0551b49.

Dedicated servers assign specific hardware and software to perform specific tasks, while private clouds allow hardware and software to be assigned dynamically. In both scenarios, the equipment is dedicated to a single company that exercises control over the infrastructure. And, in both scenarios, the costs to maintain the needed infrastructure rises with the increase in the amount of data collected.

**B.     Capital One Partners With AWS For Cloud Computing**

31.     As the costs of dedicated-servers or private-cloud solutions have increased, public clouds hosted and run by third parties, such as Amazon's AWS, Microsoft's Azure, IBM's Cloud, and Google Cloud, have developed as a cheaper alternative. Those third parties own and maintain the infrastructure, which is then leased on a scalable, dynamic basis to businesses. Because resources can be scaled to meet demand, with server space expanding or contracting based on use, a contracting business using a public cloud service may save money by only paying for the computing power and storage that it needs and not having to pay for the cost of excessive capacity or maintaining the infrastructure required of dedicated servers or a private cloud.

32.     The primary downsides of public cloud computing are the increased data security risk inherent in their use,[10] and the related difficulty of meeting regulatory hurdles regarding the security of sensitive information.[11] Accordingly, banks proved to be reticent to use public cloud services, as moving to the public cloud would require addressing access, encryption, and legal and compliance issues.[12]

33.     Despite these inherent security risks, in 2015 Capital One announced that it would move all of its data to the public cloud, and in 2016, Capital One announced that it would make AWS its predominant public cloud provider.

---

[10] *See, e.g.,* 12 *Risks, Threats, & Vulnerabilities in Moving to the Cloud,* CARNEGIE MELLON UNIVERSITY BLOG (March 5, 2018), available at https://insights.sei.cmu.edu/sei_blog/2018/03/12-risks-threats-vulnerabilities-in-moving-to-the-cloud.html.

[11] Federal Reserve Bank of Atlanta, *Supervisory Considerations in Cloud Computing in the Financial Services Industry* (May 8, 2018), available at https://www.frbatlanta.org/economy-matters/banking-and-finance/viewpoint/2018/05/supervisory-considerations-in-cloud-computing-in-the-financial-services-industry.

[12] *See id.*

34.     Amazon touted the AWS cloud environment as a technology-forward solution for Capital One's aggressive data collection strategy. Partnering with AWS allowed Capital One to use Amazon's data scientists and artificial intelligence tools[13] to analyze the trove of customer data it collected from credit applicants.

35.     The strategy was an aggressive move into uncharted territory for a major bank. Migration to AWS's cloud servers would mean that customer data would no longer be in the bank's physical custody; instead, it would be in the hands of a third-party partner, AWS.

36.     For this move to work, Capital One would have to convince its present and prospective customers that their information would be safe. With this in mind, both Capital One and AWS charted a course to make deceptive, false, misleading and unfair representations regarding the collection of customer data sitting on the public cloud.

37.     For example, in July 2015, Capital One Chief Executive Officer Richard Fairbank, noting that "increasingly we're focusing on cloud computing," assured customers that "[w]e're investing in cyber security. This is an incredibly important area and we are putting a lot of very top talent and a lot of energy and investment into that."[14]

38.     In October 2015, at an Amazon-sponsored industry event known as "AWS re:Invent 2015," Capital One's Chief Information Officer Rob Alexander used his keynote address to announce that Capital One would be shifting its data to the cloud. In those remarks he stated:

> [S]ecurity is critical for us. The financial services industry attracts some of the worst cyber criminals so we work closely with the Amazon team to develop a security model which we believe enables us to operate more securely in the public cloud than we can even in our own data centers.[15]

---

[13]  AWS, *AWS Marketplace, Data Science Tools*, available at https://aws.amazon.com/marketplace/solutions/machine-learning/data-science-tools (last visited Sept. 17, 2021).

[14] Sara Hoisington, *Capital One: Banking Is Inherently A Digital Business* (July 24, 2015), available at https://conferencetrackerblog.wordpress.com/2015/07/24/capital-one-banking-is-inherently-a-digital-business/.

[15] Rob Alexander (CIO of Capital One), *AWS re:Invent 2015 Keynote*, available at https://www.youtube.com/watch?v=0E90-ExySb8.

10

CLASS ACTION COMPLAINT

39.     Despite these public statements suggesting a commitment to data security, including data security in the cloud, Capital One instead undertook a risky move of consumer data to AWS, an environment with well-known data security vulnerabilities.

**C.     AWS Cloud Computing's Default Settings Have Known Vulnerabilities**

40.     The AWS cloud environment has long suffered from a widely known flaw. As explained in detail below, AWS servers—unlike those run by its competitors—were not secured against what are known as Server Side Request Forgery ("SSRF") attacks. Simply stated, SSRF attacks allow an intruder to penetrate a firewall and exfiltrate data to a third-party server. Year after year this flaw was the subject of discussion at some of the largest cybersecurity conferences in the United States. Each year, presentations were made expressly calling out the SSRF vulnerability in AWS's cloud computing services.[16]

41.     AWS's servers facilitate machine learning by allowing large amounts of data to be collected in a common pool, which is segmented into folders. This AWS configuration allows for different web applications to draw from a vast collection of data but also allows for the configuration of access "policies" to allow the application to pull only the data it needs, and nothing more. One way to do this is through Identity and Access Management ("IAM") roles.

42.     An IAM role is an identity created in an account that has specific permissions that determines what the identity can or cannot do in AWS. Unlike a username or credential associated with a specific person, an IAM role is intended to be assumable by anyone who needs it. An entity can use IAM roles to delegate access to users, applications, or services that do not normally have access to the restricted AWS data, or resources, stored by the owner of the cloud.[17] These IAM roles are used on AWS to allow various computers access to particular resources on a dynamic basis. For example, a computer on Capital One's system with an IAM role configured to allow

---

[16] Rob Wright, *Capital One Hack Highlights SSRF Concerns for AWS*, TECHTARGET (Aug. 5, 2019), available at https://searchsecurity.techtarget.com/news/252467901/Capital-One-hack-highlights-SSRF-concerns-for-AWS; *see also*, Sen Ron Wyden and Sen. Elizabeth Warren, Letter to FTC (Oct. 24, 2019), available at https://www.wyden.senate.gov/imo/media/doc/102419%20Wyden%20Warren%20Letter%20to%20FTC%20RE%20Amazon%20Capital%20One%20Hack.pdf.
[17] AWS, *AWS Identity and Access Management User Guide*, available at https://docs.aws.amazon.com/IAM/latest/UserGuide/id_roles.html (last visited Sept. 17, 2021).

1    broad access, as required to run machine learning algorithms for example, could allow that

2    computer to access the entire data collection while another computer with a more restrictive IAM

3    role may restrict access only to a small subset of consumer data.

4          43.    While the IAM roles work to regulate access to data within the AWS server, the

5    defense protecting the data from outside penetration is a firewall. A firewall is, in effect, a shield

6    placed between a server and traffic originating from the outside the server. It is designed to block

7    unauthorized access while permitting authorized access and outward communication.

8          44.    A firewall uses programmed rules to distinguish between legitimate access requests,

9    which it permits, and unauthorized and illegitimate access requests, which it denies. If a request is

10    legitimate, then the firewall automatically assigns the requester a "role." These roles establish what

11    portions of the server the requester will have access to as well as the conditions of that access. The

12    requester receives temporary credentials assigned to that role.

13          45.    A firewall also, among other purposes, ensures that sensitive resources on a

14    computer network are not exposed directly to the Internet. For web applications that need to pass

15    data to and from a user on the open Internet—such as a credit card application—a Web Application

16    Firewall ("WAF") is used. A WAF filters, monitors, and blocks web traffic to and from a web

17    application.

18          46.    But the firewalls used on the AWS cloud are known to be vulnerable to an SSRF

19    attack. In an SSRF attack, an attacker tricks a server—in this case the WAF—into thinking that the

20    attacker is permitted to request and access data from the server. By tricking a server into thinking

21    that it is receiving a legitimate request for resources from inside the firewall (rather than an

22    illegitimate request from outside), the attacker obtains a foothold inside the targeted network.

23          47.    However, despite this being a well-known problem deployed by hackers, at the time

24    of the Data Breach AWS had no protections built into its systems to protect against an SSRF attack.

25    Instead, because Amazon uses IAM roles to control access to sensitive resources, such as data stored

26    on the cloud, an attacker who gains access to a resource behind a firewall can then assume a

27    privileged IAM role and can gain access to whatever data the role can access. Indeed, it was well

28    known prior to the Data Breach that Amazon's Instance Metadata Service ("IMDS") contained

1 flaws that specifically allowed for SSRF attacks—essentially, by permitting users, including users

2 perpetrating an SSRF attack, to gain temporary credentials that ultimately permitted them access to

3 privileged IAM roles.[18]

48.     This vulnerability to SSRF attacks was a well-known flaw in AWS-based systems.

5 By contrast, Amazon's competitors, such as Google and Microsoft, built protections against SSRF

6 into their cloud-based products.[19]

49.     According to Evan Johnson, manager of the product security team at Cloudflare,

8 "SSRF has become the most serious vulnerability facing organizations that use public clouds . . . .

9 The impact of SSRF is being worsened by the offering of public clouds, and the major players like

10 AWS are not doing anything to fix it. The problem is common and well-known, but hard to prevent

11 and does not have any mitigations built into the AWS platform."[20]

50.     Once a malicious actor gains access to a privileged IAM role, that actor has access

13 to all data that the IAM role has access to. For example, credentials assigned with IAM roles may

14 be permissioned to automatically decrypt the data the role is allowed to access. IAM roles may also

15 allow the user who assumes the role to obtain large amounts of data. Therefore, if an intruder is

16 able to gain access to an IAM role and get past the firewall, the IAM role will decrypt the data,

17 allowing the unauthorized user the ability to obtain unencrypted data. In other words, one key

18 unlocks both sets of doors—the firewall and the encryption.

---

[18] *See* AWS Enhances Metadata Service Security (Nov. 22, 2019), available at https://medium.com/@shurmajee/aws-enhances-metadata-service-security-with-imdsv2-b5d4b238454b (describing how SSRF attacks have been perpetrated against AWS's IMDS for years and that AWS only released an update to IMDS with added protections after the Data Breach); AWS Adds New Protections Against SSRF (Nov. 20, 2019), available at https://duo.com/decipher/aws-adds-new-protections-against-ssrf-other-web-app-attacks

[19] *See* Letter from Senators Elizabeth Warren and Ron Wyden to the Federal Trade Commission (Oct. 24, 2019), available at https://www.wyden.senate.gov/imo/media/doc/102419%20Wyden%20Warren%20Letter%20to%20FTC%20RE%20Amazon%20Capital%20One%20Hack.pdf; *see also Is AWS Liable in Capital One Data Breach*, THREATPOST (Oct. 25, 2019), available at https://threatpost.com/capital-one-breach-senators-aws-investigation/149567/.

[20] *What We Can Learn from the Capital One Hack*, KREBS ON SECURITY (Aug. 2, 2019), available at https://krebsonsecurity.com/2019/08/what-we-can-learn-from-the-capital-one-hack/.

13

CLASS ACTION COMPLAINT

51.    At Amazon's yearly re:Invent conference in November 2018, Capital One's Senior Distinguished Engineer Kapil Thangavelu gave a presentation.[21] Several minutes into his presentation, Thangavelu discussed IAM roles and described the precise vulnerability in "S3"[22]— the AWS cloud service—that would result in the Data Breach the next year:

> In the cloud, all these resources are just available via URL so those are part of your network boundary. And those resources that have embedded IAM policies need special care and attention because they can be enabled to be accessible outside of your account. I think everyone's familiar with some of the things around S3 but that extends out to a lot of the other resources I called out a couple here.[23]

52.    With S3, IAM roles determine what buckets of data on the server the user is allowed to access. Thus, if a company grants broad permissions to its IAM roles, then an unauthorized user who gains access to an IAM role also gains broad access to all of the now-unencrypted data stored in the cloud environment. With that presentation, Capital One's Senior Distinguished Engineer[24] acknowledged the known vulnerability in AWS's system with respect to the interaction between Amazon's SSRF cloud vulnerability and over-permissioned IAM roles. And that risk still existed in 2019.

53.    Capital One and Amazon appreciated and intentionally assumed a known risk that a broadly configured IAM role, if assumed from inside the firewall, would grant full access to the data stored on an AWS server. It was this known vulnerability, amongst others, that allowed the theft of Capital One's customer data in March 2019.

**D.    The Known Vulnerability is Exploited**

54.    On July 29, 2019, Capital One announced in a filing with the Securities Exchange Commission ("SEC") that it had experienced a data breach affecting "approximately 100 million individuals in the United States and approximately 6 million in Canada."[25]

55.    As detailed in the criminal complaint filed by the Federal Bureau of Investigation ("FBI") against the alleged hacker, Paige A. Thompson (a/k/a "erratic"), Thompson publicly posted

---

[21] Kapil Thangavelu, *AWS re:Invent 2018: Cloud Custodian - Open Source AWS Security & Governance* (DEM78), available at https://www.youtube.com/watch?v=oY8Nmh6B7P8
[22] Amazon Simple Storage, known as S3.
[23] *AWS re:Invent 2018: Cloud Custodian, supra* n. 27.
[24] In January 2019, approximately one month after his presentation at re:Invent 2018, Thangavelu left Capital One and joined Amazon AWS as a Principal OpenSource Technologist.
[25] July 29 Form 8-K.

instructions about how to access the stolen data on Github, a software development platform on which users can share information or collaborate on open source code projects, in a file timestamped April 21, 2019.[26] Thompson had previously worked as a "systems engineer" for Defendant Amazon Web Services.

56.     Capital One learned about the Data Breach from an anonymous tip sent by email on July 17, 2019.[27] The email advised that data belonging to Capital One had been posted on GitHub and provided the address of the GitHub file containing the data.[28]

57.     According to Defendants, the intrusion occurred through a misconfigured Web Application Firewall (WAF) that Capital One was using as part of its operations hosted in the cloud with AWS.

58.     Capital One had worked closely with multiple groups at Amazon to set up the cloud systems and to migrate the customer data to the cloud.[29]

59.     The firewall misconfiguration permitted commands that reached and were executed by a server. The commands executed by the hacker accomplished the following:

---

[26] *See United States v. Paige A. Thompson, a/k/a "erratic,"* Complaint at 10, Case No. 2:19-mj-00344 (W.D. Wash.) (filed July 29, 2019) (hereinafter, "Thompson Criminal Complaint"), available at https://www.justice.gov/usao-wdwa/press-release/file/1188626/download. On July 29, 2019, Thompson was arrested by the FBI and charged by federal prosecutors in the United States District Court for the Western District of Washington. The charges included computer fraud and abuse in violation of 18 U.S.C. § 1030(a)(2).
[27] *Id.* at ¶ 9.
[28] *Id.*
[29] *See, e.g.,* Stephen Orban, *Capital One's Cloud Journey Through the Stages of Adoption,* MEDIUM (April 5, 2017), *available at* https://medium.com/aws-enterprise-collection/capital-ones-cloud-journey-through-the-stages-of-adoption-bb0895d7772c.

a.   Obtained security credentials for an account known as WAF-Role that allowed access to Capital One's data folders on the AWS cloud;

b.   Used the security credentials to list the names of the Capital One data folders on the AWS cloud ("List Buckets Command"); and,

c.   Used the security credentials to extract or copy data from the Capital One data folders on the AWS cloud ("Sync Command").[30]

60.   Capital One has confirmed that the commands function to obtain security credentials on the AWS cloud environment and that these commands could be used to extract data.[31]

61.   Capital One has confirmed that the List Buckets Command was executed on April 21, 2019, which matches the timestamp of the Github file.[32]

62.   While AWS has blamed Capital One for the Data Breach, it has also admitted that the SSRF vulnerability of its cloud environment played a role:

> As Capital One outlined in their public announcement, the attack occurred due to a misconfiguration error at the application layer of a firewall installed by Capital One, exacerbated by permissions set by Capital One that were likely broader than intended. After gaining access through the misconfigured firewall and having broader permission to access resources, we believe a SSRF attack was used (which is one of several ways an attacker could have potentially gotten access to data once they got in through the misconfigured firewall).[33]

63.   Online, the hacker publicly exposed the code and processes through which she had discovered the vulnerability in the configuration of the WAF used by Capital One, as well as the code and processes she used to gain access to the stolen data through that misconfiguration.

64.   While the intrusion was sophisticated because of the abilities of the hacker and how she performed the hack, the vulnerability of the WAF in combination with the IAM roles used by the hacker to infiltrate was, as described *supra*, well known.

---

[30] Thompson Criminal Complaint at ¶ 11.
[31] *Id.* at ¶ 12.
[32] *Id.*
[33] AWS Letter to The Honorable Ron Wyden, United States Senate, at 1 (August 13, 2019), available at https://www.wyden.senate.gov/imo/media/doc/081319%20Amazon%20Letter%20to%20Sen%20Wyden%20RE%20Consumer%20Data.pdf.

65.     Shortly after the Data Breach, Capital One and AWS worked to fix the WAF configuration to address the known vulnerability.

66.     Capital One subsequently determined that 1.75 terabytes of consumer data was downloaded on or about March 22-23, 2019, although the initial hacking began weeks before. Capital One determined that the hacker first scanned its network on March 4, 2019 for vulnerabilities and first accessed its network on March 12, 2019, prior to her March 22-23 access and exfiltration. Capital One believes the hacker probed its environment three additional times on April 2, April 19, and May 26, 2019.[34]

67.     Capital One's post-breach investigation revealed that the company's logs showed a number of connections or attempted connections to the AWS server from an Onion Router (also known as "TOR"), an anonymity tool used by individuals to conceal their identities and their IP address, and a number of connections from a specific IP address in March and April 2019.[35] During these March and April 2019 connections, the WAF-Role account was used to execute the List Buckets Command as well as the Sync Command to extract or copy data from Capital One's data folders on the AWS cloud environment.[36] Capital One has confirmed that unauthorized activity occurred on its AWS server on March 12, 22 and 23, 2019 and on April 21, 2019.[37]

68.     That Capital One's own logs recorded multiple instances of unauthorized access and attempts of unauthorized access during March 2019, yet Capital One only learned of the Data Breach four months later from an anonymous tip, suggests that Capital One did not have adequate Security Incident and Event Management ("SIEM") policies in place requiring IT-security events to be logged in a centralized location and monitored in real time.

69.     Indeed, the length of time the Data Breach went unnoticed and undetected by Defendants is astonishing, in light of both the public postings made by the alleged hacker Thompson and the activity on the AWS server. In parallel proceedings, Capital One has admitted that it

---

[34] *In re: Capital One Consumer Data Security Breach Litigation*, MDL No. 1:19-md-2915 (AJT/JFA), Doc. 971, Second Amended Representative Consumer Class Action Complaint, at Paragraph 72 (citing Capital One Defendants' Responses to Plaintiffs' First Interrogatories, at Answer to Interrogatory 9).
[35] Thompson Criminal Complaint at ¶ 13.
[36] *Id.* at ¶¶ 11-13.
[37] *See* July 29 Form 8-K; Thompson Criminal Complaint at ¶ 13.

received alerts related to the breach on March 22, April 19, and May 20, 2019, which it purports to have investigated. The May 20, 2019 alert came from Amazon who had received a handwritten note warning Amazon and Capital One that "Open Socks Proxy **.***.**.136 Can Hit IMS – lots of security credentials." Capital One now believes that the hacker stole a valid Capital One AWS Credential for its Instance Metadata Service ("IMS") role – the role mentioned in the anonymous alert.[38]

70.    Capital One and Amazon also did not detect the Data Breach despite the fact that the hacker spent months posting publicly about the Data Breach online.

71.    On or about June 26, 2019, "erratic" publicly posted on a Slack channel a list of files she claimed to possess, among which two referenced "WAF-Role."[39] The Sync Command placed extracted files in a directory containing the name WAF-Role.

72.    On or about June 27, 2019, "erratic" posted about several companies, governmental entities, and education entities, and referred to an account associated with Capital One.[40]

73.    On or about July 4, 2019, the alleged hacker Thompson posted a message seeking information about the "Snappy Parquet File" which was a named file in the Capital One directory on the AWS server and was determined to be one of the files exfiltrated from Capital One on March 22, 2019.[41]

---

[38] *In re: Capital One Consumer Data Security Breach Litigation*, MDL No. 1:19-md-2915 (AJT/JFA), Doc. 971, Second Amended Representative Consumer Class Action Complaint, at Paragraph 72 (citing Capital One Defendants' Amended Responses to Plaintiffs' First Interrogatories, at Answers to Interrogatories 8-9).
[39] Thompson Criminal Complaint at ¶ 18.
[40] *Id.* at ¶ 19.
[41] *Id.* at ¶ 22.

74.     Cybersecurity investigative reporter Brian Krebs reported that Thompson posted openly on her Twitter account over the course of several months about finding huge files of data intended to be secured on various AWS cloud servers.[42]



75.     The length of time the Github file remained publicly posted without Defendants' knowledge suggests that neither Capital One nor Amazon employed threat intelligence to monitor the dark web for activity involving its data, a standard practice in the financial industry.

76.     Because the hacker placed the script and code she used in public areas, the code and processes could have been used by others to gain access to Capital One's customer data via the WAF vulnerability.

77.     Further, the hacker has now been charged in a Superseding Indictment with attempting to use the stolen PII to commit theft and fraud.[43]

**E.      The Scope of the Data Breach**

78.     The scope of the breach was staggering, with compromised data going back over a decade to 2005.

---

[42] *Capital One Data Theft Impacts 106M People, supra* n.2.
[43] Superseding Indictment Against Paige Thompson (June 17, 2021), available at https://www.justice.gov/usao-wdwa/page/file/1405446/download (charging Thompson with additional counts, including Count 9 – Access Device Fraud and Count 10 – Aggravated Identity Theft).

79.     Capital One reported that the Data Breach impacted consumers who applied for Capital One credit card products from 2005 through "early 2019," and that the compromised information included "personal information Capital One routinely collects at the time it receives credit card applications, including names, addresses, zip codes/postal codes, phone numbers, email addresses, dates of birth, and self-reported income."[44]

80.     In addition, Capital One also admitted the Data Breach included consumers' credit scores, credit limits, balances, payment histories, contact information, and "fragments of transaction data from a total of 23 days during 2016, 2017 and 2018."[45]

81.     Capital One further admitted that "about 140,000 Social Security numbers of [its] credit card customers" and "about 80,000 linked bank account numbers of our secured credit card customers" were also disclosed in the Data Breach.[46]

82.     Capital One's retention of data far exceeds customers' reasonable expectations of how long their data would be stored and how their data would be used.

F.      **Defendants' Knowledge of Cyber Security Threats**

83.     At all relevant times, Defendants were well-aware, or reasonably should have been aware, that the PII collected, maintained, and stored on the cloud is highly sensitive, susceptible to attack, and could be used for malicious purposes by third parties, such as identity theft, fraud and other misuse.

84.     Banking repositories and databases are popular and well-known targets for cyberattacks, especially given the extremely sensitive nature of the PII stored on those repositories and databases. The frequency and prevalence of attacks make it imperative that banks such as Capital One routinely and constantly monitor for exploits and cyberattacks and regularly update their software and security procedures.

85.     Capital One was fully aware that it was a prime target of cyber threats. In its 2018 Form 10-K, Capital One discussed the threat of cyber-attacks at length, including acknowledging that it is a target: "cyber and information security risks for large financial institutions like us have

---

[44] July 29 Form 8-K.
[45] *Id.*
[46] *Id.*

generally increased in recent years" and that "[w]e and other U.S. financial services providers continue to be targeted with evolving and adaptive cybersecurity threats from sophisticated third parties."[47]

86.     With respect to cyber-security threats directed at the cloud, Capital One specifically noted that it may "face an increasing number of attempted cyber-attacks as we expand . . . our usage of mobile and cloud technologies and as we provide more of these services to a greater number of retail clients."[48]

87.     Capital One itself acknowledges that "[s]afeguarding our customers' information is essential to our mission and our role as a financial institution."[49] To protect against these risks, Capital One touted its "robust suite of authentication and layered information security controls, including our cyber threat analytics, data encryption and tokenization technologies, anti-malware defenses and vulnerability management program[.]"[50] Yet Capital One's supposedly robust systems did not detect the repeated unauthorized access and access attempts of its system.

88.     Further, Capital One has experienced data breaches before. For example, in July 2017, Capital One disclosed to customers that a former employee had accessed customer information over a three-month period. The customer information accessed in that data breach included names, account numbers, telephone numbers, transaction history, dates of birth, and Social Security Numbers.[51]

89.     In addition to its appreciation of threats imposed by external attacks, Capital One— and Amazon—were aware, or should have been aware, of security vulnerabilities posed by current and former employees of both Capital One and Amazon, as well as the well-known security vulnerabilities to the cloud, as described *supra*.

---

[47] Capital One Financial Corporation, 2018 Form 10-K, at 24 ("2018 Form 10-K"), available at https://www.sec.gov/Archives/edgar/data/927628/000092762819000093/cof1231201810kfinal.pdf.
[48] *Id.*
[49] July 29 Form 8-K.
[50] 2018 Form 10-K, at 24.
[51] July 2017 Capital One Data Breach Notice, available at https://dojmt.gov/wp-content/uploads/Capital-One-1.pdf.

90.     Despite being the holder of PII for millions of individuals and businesses worldwide, Capital One failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to their highly-sensitive databases. Capital One had the resources to prevent a breach and made significant expenditures to market their credit card and banking services, but neglected to invest adequately in data security, despite the growing number of well-publicized data breaches affecting the financial industry and similar industries.

**G.     The Capital One Defendants Breached Their Promises to Plaintiffs**

91.     Capital One's Privacy and Opt-Out Notice promises its customers, a term defined to include applicants, current customers, and former customers of Capital One and its affiliates, that it will protect the "personal information [the customers provide in order to obtain the services] from unauthorized access and use [by employing] security measures that comply with federal law."[52]

92.     Further, in its Privacy Statement, Capital One advises its customers:

> At Capital One, we make your safety and security a top priority and are committed to protecting your personal and financial information. If we collect identifying information from you, we will protect that information with controls based upon internationally recognized security standards, regulations, and industry-based best practices.[53]

93.     Yet, despite these promises to protect its customers' Personal Information, Capital One failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to Plaintiffs' and class members data. Capital One had the resources to prevent a breach and made significant expenditures to market their credit card and banking services, but neglected to adequately invest in data security, despite its promises to do so. As a result, an unauthorized individual was able to exploit a well-known vulnerability and steal Capital One's customers' unencrypted data.

**H.     Defendants Failed to Comply with Regulatory Requirements and Industry Practices**

94.     As Capital One acknowledges in its Privacy Statement, federal and state regulators have established security standards and issued recommendations to temper data breaches and the

---

[52] Capital One, *Privacy and Opt-Out Notice*, https://www.capitalone.com/privacy/notice/en-us/ (last visited Sept. 17, 2021).
[53] Capital One, *Capital One Online & Mobile Privacy Statement*, available at https://www.capitalone.com/bank/mobile-privacy-statement/disclosures/ (last visited Sept. 17, 2021).

resulting harm to consumers and financial institutions. There are a number of state and federal laws and requirements and industry standards governing the protection of PII.

95.    For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain personal information, or PII, about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access. California is one such state and requires that "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use modification or disclosure." Cal. Civ. Code § 1798.81.5(b).

96.    The Federal Trade Commission ("FTC"), which is responsible for enforcing the Safeguards Rule, has issued guidance and published regulatory decisions interpreting the measures financial institutions must take to comply with the Safeguards Rule. The FTC recommends:

- limiting access to customer information to employees who have a business reason to see it;

- keeping customer information in encrypted files provides better protection in case of theft;

- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;

- monitoring both in- and out-bound transfers of information for indications of a compromise, such as unexpectedly large amounts of data being transmitted from your system to an unknown user; and,

- monitoring activity logs for signs of unauthorized access to customer information.[54]

---

[54] Federal Trade Commission, *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, available at https://www.ftc.gov/tips-advice/business-center/guidance/financial-institutions-customer-information-complying (last visited Sept. 17, 2021).

97.     The Federal Trade Commission has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[55]

98.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[56] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

99.     The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[57]

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[55]   Federal   Trade   Commission,   *Start   With   Security*   at   2,   available   at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Sept. 17, 2021).
[56] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at       https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 17, 2021).
[57] FTC, *Start With Security, supra.*

101.    The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information[58] and failure to segregate access to information[59] may violate the FTC Act.

102.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data (i.e., PII) constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

103.    The PCI (Payment Card Industry) Security Standards Council, of which Capital One is a participant, has published its *Payment Card Industry (PCI) Data Security Standard: Requirements and Security Assessment Procedures* ("PCI-DSS"), the latest version of which (3.2.1) is dated May 2018.[60]

104.    Capital One violated the mandates of PCI-DSS concerning data retention, encryption, and access.

105.    In this case, Capital One was at all times fully aware of its obligation to protect the financial data—including PII—of Capital One's applicants because of its status as a one of the United States' largest financial institutions. Capital One was also aware of the significant repercussions if it failed to do so because Capital One collected applicant data from millions of consumers daily and it knew that this data, if hacked, would result in injury to consumers, including Plaintiffs and class members.

## I.    Capital One is Subject to the Gramm-Leach-Bliley Act

106.    Capital One is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

---

[58] *In the Matter of LabMD, Inc.*, Dkt. No. 9357, Slip Opinion, at 15 ("Procedures should be in place that restrict users' access to only that information for which they have a legitimate need."), available at https://www.ftc.gov/system/files/documents/cases/160729labmd-opinion.pdf.
[59] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 258 (3d Cir. 2015) (companies should use "readily available security measures to limit access between" data storage systems).
[60] *Payment Card Industry Data Security Standard* v3.2.1 (May 2018), available at https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2-1.pdf?agreement=true&time=1580206053881.

107.    The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

108.    Capital One collects nonpublic PII, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Capital One was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1 *et seq*., and is subject to numerous rules and regulations promulgated on the GLBA statutes.

109.    The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

110.    Accordingly, Capital One's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

111.    Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic PII the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic PII. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Capital One violated the Privacy Rule and Regulation P.

112. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Capital One violated the Safeguard Rule.

113. Capital One failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information.

114. Capital One's conduct resulted in a variety of failures to follow GLB mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Capital One failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII it maintained in its data systems, instead outsourcing such responsibilities to the Amazon Defendants.

115. More specifically, Capital One's security failures demonstrate that it failed to honor its express and implied promises by failing to:

    a.    Maintain an adequate data security system to reduce the risk of data breaches and cyber attacks;

    b.    Adequately protect Plaintiff's and class members' PII;

c.     Implement policies and procedures to prevent, detect, contain, and correct security violations;

d.     Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

e.     Protect against any reasonably anticipated threats or hazards to the security or integrity of PII; and

f.     Effectively train all members of its workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PII.

116.   Had Capital One implemented the above-described data security protocols, the consequences of the data exposure could have been avoided, or at least significantly reduced as the exposure could have been detected earlier, the amount of PII compromised could have been greatly reduced, and affected consumers could have been notified—and taken protective/mitigating actions—much sooner.

117.   Moreover, the regulatory bodies that oversee Capital One, the Office of the Comptroller of the Currency ("OCC") and Federal Reserve Bank ("FRB") issued consent orders against Capital One for violations of the GLBA with respect to the Data Breach and fined Capital One $80 million.[61]

## J.   Defendants' Delays in Discovery and Notice of the Data Breach

118.   It took Defendants approximately four months—from March to July 2019—to realize Capital One's vast collection of customer and applicant PII stored on the AWS cloud had been breached. That discovery occurred not because of Defendants' own diligence, but because an unknown third party alerted Capital One.

119.   Further compounding the negative consequences of the Data Breach, Defendants then failed to provide timely notice to affected class members. Remarkably, Capital One chose not to directly notify the vast majority of individuals affected by the Data Breach; rather, it merely published a press release, leaving victims in the dark as to whether their information had, in fact,

---

[61] *See* OCC Cease and Desist Order to Capital One (Aug. 5, 2020), available at https://www.occ.gov/static/enforcement-actions/ea2020-037.pdf; OCC Civil Fine (Aug. 5, 2020), available at https://www.occ.gov/static/enforcement-actions/ea2020-036.pdf; FRB Cease and Desist Order (Aug. 4, 2020), available at https://www.federalreserve.gov/newsevents/pressreleases/files/enf20200806a1.pdf.

1  been compromised. Without detailed disclosures to Capital One's customers, many class members

2  are even to this day unknowingly and unwittingly left exposed to continued misuse and ongoing

3  risk of misuse of their PII without being able to take necessary precautions to prevent imminent

4  harm.

5       120.    Defendants' delays in discovering and announcing the breach left all Plaintiffs and

6  class members exposed and unable to take precautions.

7  **K.    The Effect of the Data Breach on Impacted Customers**

8       121.    Defendants' failure to keep Plaintiffs' and class members' PII secure has severe

9  ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, addresses,

10  zip codes, phone numbers, email addresses, dates of birth, self-reported income, Social Security

11  Numbers, bank account numbers, credit scores, credit limits, credit balances, payment history, and

12  fragments of transaction data—fraudsters have the ability to commit identity theft, financial fraud,

13  and other identity-related fraud against Plaintiffs and class members now and into the indefinite

14  future.

15       122.    The PII exposed in the Data Breach is highly-coveted and valuable on underground

16  or black markets. For example, a cyber "black market" exists in which criminals openly post and

17  sell stolen consumer information on underground internet websites known as the "dark web"—

18  exposing consumers to identity theft and fraud for years to come. Identity thieves can use the PII

19  to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the

20  real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c)

21  commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name;

22  (e) obtain fraudulent government benefits or medical treatment; (f) file a fraudulent tax return using

23  the victim's information; (g) commit espionage; or (h) commit any number of other frauds, such as

24  obtaining a job, procuring housing, or giving false information to police during an arrest.

25       123.    This is especially true for data held by banks, given that the PII compromised in this

26  Data Breach was precisely the PII Capital One used to extend credit to customers, meaning data

27  thieves had access to a single data set to commit fraud through, for example, opening new lines of

28  credit.

1      124.    PII has significant monetary value in part because criminals continue their efforts to

2  obtain this data.[62] In other words, if any additional breach of sensitive data did not have incremental

3  value to criminals, one would expect to see a reduction in criminal efforts to obtain such additional

4  data over time. Instead, just the opposite has occurred. For example, the Identity Theft Resource

5  Center reported 1,473 data breaches in 2019, which represents a 17 percent increase from the total

6  number of breaches reported in 2018.[63]

7      125.    The PII of consumers remains of high value to identity criminals, as evidenced by

8  the prices criminals will pay through black-market sources on the dark web. Numerous sources cite

9  dark web pricing for stolen identity credentials, quantifying the loss to victims based on the value

10  of the data itself. For example, a complete set of bank account credentials can fetch a thousand

11  dollars or more.[64]

12      126.    Just as companies like Capital One and Amazon trade on the value of consumers'

13  PII, consumers recognize the value of their PII and offer it in exchange for goods and services.

14  Plaintiffs gave Capital One their PII in exchange for Capital One's services, such as providing or

15  potentially providing credit. Further, the value of PII is key to unlocking many parts of the financial

16  sector for consumers. Whether someone can obtain a mortgage, credit card, business loan, tax

17  return, or even apply for a job depends on the integrity of their PII. Similarly, the businesses that

18  request (or require) consumers to share their PII as part of a commercial transaction do so with the

19  expectation that its integrity has not been compromised.

20

21

22

23

---

24  [62] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, CIO MAGAZINE (Sept. 28, 2014),
25  available    at    http://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html.
26  [63] Identity Theft Center,    *2019 End-of-Year Data Breach Report* (2019), available at
27  https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf.
28  [64] *Here's How Much Thieves Make By Selling Your Personal Data Online,* BUSINESS INSIDER
(May 27, 2015), available at http://www.businessinsider.com/heres-how-much-your-personal-data-costs-on-the-dark-web-2015-5.

1    127.   Annual monetary losses for victims of identity theft are in the billions of dollars. In

2   2017, fraudsters stole $16.8 billion from consumers in the United States, which includes $5.1 billion

3   stolen through bank account take-overs.[65]

4    128.   The annual cost of identity theft is even higher. McAfee and the Center for Strategic

5   and International Studies estimates that the likely annual cost to the global economy from

6   cybercrime is $445 billion a year.[66]

7    129.   For class members who had their Social Security numbers exposed, the unauthorized

8   disclosure can be particularly damaging because, unlike a credit card, Social Security numbers

9   cannot easily be replaced. In order to obtain a new number, a person must prove, among other

10  things, he or she continues to be disadvantaged by the misuse. Thus, under current rules, no new

11  number can be obtained until the damage has been done. Furthermore, as the Social Security

12  Administration warns:

13
> Keep in mind that a new number probably won't solve all your problems. This is
14  because other governmental agencies (such as the Internal Revenue Service and
> state motor vehicle agencies) and private businesses (such as banks and credit
15  reporting companies) likely will have records under your old number. Along with
> other personal information, credit reporting companies use the number to identify
16  your credit record. So using a new number won't guarantee you a fresh start. This
> is especially true if your other personal information, such as your name and address,
> remains the same.
17
> If you receive a new Social Security Number, you shouldn't use the old number
18  anymore.

19
> For some victims of identity theft, a new number actually creates new problems. If
20  the old credit card information is not associated with the new number, the absence
> of any credit history under the new number may make it more difficult for you to
21  get credit.[67]

22   130.   Reimbursing a consumer for a financial loss due to fraud does not make that

23  individual whole again. On the contrary, in addition to the irreparable damage that may result from

24  the theft of a Social Security Number, identity theft victims must spend numerous hours and their

25  [65] Javelin, *2018 Identity fraud: Fraud Enters A New Era of Complexity*, available at
    https://www.javelinstrategy.com/coverage-area/2018-identity-fraud-fraud-enters-new-era-
26  complexity (last visited Sept. 17, 2021).
    [66] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at
27  https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Sept.
    17, 2021).
28  [67] Social Security Administration, *Identity Theft and Your Social Security Number*, available at
    https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sept. 17, 2021).

own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[68]

131.   And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans, such as student loans or mortgages.[69] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

132.   It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey[70] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed
- 67% reported anxiety
- 66% reported feelings of fear related to personal financial safety
- 37% reported fearing for the financial safety of family members
- 24% reported fear for their physical safety
- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft
- 7% reported feeling suicidal.

133.   Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

[68] U.S. Department of Justice, *Victims of Identity Theft, 2014* (Revised November 13, 2017), available at http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Sept. 17, 2021).
[69] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, available at https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited Sept. 17, 2021).
[70] *Id.*

- 48.3% of respondents reported sleep disturbances

- 37.1% reported an inability to concentrate / lack of focus

- 28.7% reported they were unable to go to work because of physical symptoms

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues)

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[71]

134.   There may also be a significant time lag between when PII is stolen and when it is actually misused. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[72]

135.   As the result of the Data Breach, Plaintiffs and class members have suffered and/or will suffer or continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- purchasing services they would not have otherwise paid for and/or paying more for services than they otherwise would have paid, had they known the truth about Defendants' substandard data security practices;

- losing the inherent value of their PII;

- losing the value of the unauthorized access to their PII permitted by Defendants;

- losing the value of Capital One's explicit and implicit promises of adequate data security;

- identity theft and fraud resulting from the theft of their PII;

- costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

- costs associated with purchasing credit monitoring and identity theft protection services;

---

[71] *Id.*

[72] U.S. Government Accountability Office, *Report to Congressional Requesters* (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Sept. 17, 2021).

CLASS ACTION COMPLAINT

- the present value of credit monitoring and identity theft protection services necessary to restore Plaintiffs and class members as near as possible to the position they would have been in but for Defendants' wrongful conduct;

- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- lowered credit scores resulting from credit inquiries following fraudulent activities;

- costs associated with time spent and the loss of productivity or the enjoyment of their lives from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and

- the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

136.    Additionally, Plaintiffs and class members place significant value on data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[73]

137.    Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Capital One would have no reason to tout their data security efforts to their actual and potential customers.

138.    Consequently, had Plaintiffs and class members known the truth about Defendants' data security practices—that Defendants would not adequately protect and store their data—they would not have entrusted their PII to Capital One, applied for a Capital One credit card or remained

---

[73] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html    (last visited Sept. 17, 2021).

1   a Capital One customer, and would not have been willing to pay as much for Capital One's services.

2   As such, Plaintiffs and class members did not receive the benefit of their bargain with Capital One

3   because they paid for a value of services they expected but did not receive.

4   <div align="center">**CLASS ACTION ALLEGATIONS**</div>

5       139.    Plaintiffs bring this action under California Code of Civil Procedure section 382 on

6   behalf of themselves, and all persons similarly situated. Plaintiffs seek certification of the following

7   Class:

8       **All California citizens whose PII was compromised in the Data Breach.**

9       140.    Excluded from the Class are Defendants, any entity in which any Defendant has a

10   controlling interest, and Defendants' officers, directors, legal representatives, successors,

11   subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this

12   matter, members of their immediate family, and members of their judicial staff.

13       141.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

14   there is a well-defined community of interest in the litigation and the proposed Class is easily

15   ascertainable.

16       142.    Plaintiffs hereby reserve the right to amend or modify the class definitions with

17   greater specificity or division after having had an opportunity to conduct discovery.

18       143.    This action satisfies the predominance, typicality, numerosity, superiority, and

19   adequacy of representation requirements under § 382.

20       144.    **Numerosity.** The members of the Class are so numerous and geographically

21   dispersed that the joinder of all members is impractical. While the exact number of class members

22   is unknown to Plaintiffs at this time, Capital One has acknowledged that the PII of approximately

23   98 million persons throughout the United States was compromised in the Data Breach, and the PII

24   of many millions of persons throughout California is included in those numbers.

25       145.    **Predominance of Common Issues.** This action involves common questions of law

26   and fact that predominate over any questions affecting individual class members. The common

27   questions include:

28

<div align="center">35
CLASS ACTION COMPLAINT</div>

a. Whether Defendants knew or should have known that their computer and data storage systems were vulnerable to attack, including but not limited to, that their web application firewall was misconfigured and vulnerable to attack by an SSRF or otherwise;

b. Whether Defendants omitted or misrepresented material facts regarding the security of their computer and data storage systems and their inability to protect the vast amounts of consumer data, including Plaintiffs and class members' PII, hosted by the Amazon Defendants for the Capital One Defendants;

c. Whether Defendants failed to take adequate and reasonable measures to ensure such computer and data systems were protected;

d. Whether Defendants failed to take available steps to prevent and stop the Breach from happening;

e. Whether Defendants owed tort duties to Plaintiffs and class members to protect their PII;

f. Whether Defendants owed a duty to provide timely and accurate notice of the Data Breach to Plaintiffs and class members;

g. Whether Defendants breached their duties to protect the PII of Plaintiffs and class members by failing to provide adequate data security;

h. Whether Defendants' failure to secure Plaintiffs and class members' PII in the manner alleged California state and local laws, or industry standards;

i. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach, resulting in the unauthorized access to and/or theft of Plaintiffs and class members' PII;

j. Whether Capital One has a contractual obligation to use reasonable security measures and whether it complied with such contractual obligation;

k. Whether Defendants' conduct amounted to violations of California consumer protection statutes, and/or state data breach statutes;

l.   Whether, as a result of Defendants' conduct, Plaintiffs and class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled;

m.   Whether the Capital One Defendants should retain the money paid by Plaintiffs and class members to protect their PII;

n.   Whether Defendants should retain Plaintiffs and class members' valuable PII;

o.   Whether, as a result of Defendants' conduct, Plaintiffs and class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

146.   **Typicality.** As to the Class, Plaintiffs' claims are typical of other class members' claims because Plaintiffs and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

147.   **Adequacy.** Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

148.   **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action

1  device presents far fewer management difficulties and provides the benefits of a single adjudication,

2  economies of scale, and comprehensive supervision by a single court.

3       149.  **Injunctive and Declaratory Relief.** Class certification is also appropriate because

4  each Defendant, through its uniform conduct, acted or refused to act on grounds generally

5  applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class

6  as a whole.

7       150.  Likewise, particular issues may be appropriate for certification because such claims

8  present only particular, common issues, the resolution of which would advance the disposition of

9  this matter and the parties' interests therein.

10       151.  Finally, all members of the proposed Class are readily ascertainable. Capital One

11  has access to information, and Amazon hosts information, regarding which individuals were

12  affected by the Data Breach. Using this information, the members of the Class can be identified and

13  contact information ascertained for purposes of providing notice to the Class.

14  <div align="center">**FIRST CAUSE OF ACTION**</div>

15  <div align="center">**NEGLIGENCE**</div>

16  <div align="center">Against all Defendants, On Behalf of Plaintiffs and the Class</div>

17       152.  Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

18       153.  The Capital One Defendants required Plaintiffs and class members to submit

19  sensitive personal information, including their PII, in order to obtain credit card and banking

20  services. The Capital One Defendants and the Amazon Defendants stored this vast treasure trove

21  of PII on the Amazon Defendants' cloud computing platforms.

22       154.  By collecting, storing, using, and profiting from this data, the Capital One

23  Defendants and the Amazon Defendants each had a duty of care to Plaintiffs and class members to

24  exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting

25  this PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by

26  unauthorized persons. More specifically, this duty included, among other things: (a) designing,

27  maintaining, and testing Defendants' security systems and data storage architecture to ensure that

28  Plaintiffs and class members' PII was adequately secured and protected; (b) implementing

<div align="center">38</div>
<div align="center">CLASS ACTION COMPLAINT</div>

processes that would detect an unauthorized breach of Defendants' security systems and data storage architecture in a timely manner; (c) timely acting upon all warnings and alerts, including public information, regarding Defendants' security vulnerabilities and potential compromise of the compiled data of Plaintiffs and millions of class members; and (d) maintaining data security measures consistent with industry standards.

155.   The Capital One Defendants and the Amazon Defendants had common law duties to prevent foreseeable harm to Plaintiffs and class members. These duties existed because Plaintiffs and class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendants also knew that it was more likely than not Plaintiffs and other class members would be harmed by such theft.

156.   Defendants had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PII that was collected and stored on the Amazon Defendants' cloud computing platforms.

157.   Defendants' duties to use reasonable security measures also arose because of the special relationship that existed between Defendants, on the one hand, and Plaintiffs and class members, on the other hand. The special relationship arose because Plaintiffs and class members entrusted Defendants with their PII as part of the applications for, opening, or use of credit cards or banking services with the Capital One Defendants. Defendants alone could have ensured that their security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

158.   Defendants' duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendants' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

159.    Capital One's duty to use reasonable security measures also arose under the GLBA, under which Capital One was required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

160.    Defendants knew or should have known that the Amazon Defendants' cloud computing systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII.

161.    Defendants breached the duties they owed to Plaintiffs and class members described above and thus were negligent. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiffs and class members; (b) detect the breach while it was ongoing or even promptly after it occurred; and (c) maintain security systems consistent with industry standards.

162.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and class members, their PII would not have been compromised.

163.    As a direct and proximate result of the Capital One Defendants' negligence and the Amazon Defendants' negligence, Plaintiffs and class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; lost value of the unauthorized access to their PII permitted by Defendants; the present value of credit monitoring and identity theft protection services necessary to restore Plaintiffs and

1  class members as near as possible to the position they would have been in but for Defendants'

2  wrongful conduct; and other economic and non-economic harm.

3  **SECOND CAUSE OF ACTION**

4  **NEGLIGENCE *PER SE***

5  Against all Defendants, On Behalf of Plaintiffs and the Class

6      164.    Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

7      165.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or

8  affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

9  by Defendants of failing to use reasonable measures to protect PII. Various FTC publications and

10  orders also form the basis of Defendants' duty.

11      166.    Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing

12  to use reasonable measures to protect PII and not complying with industry standards. Defendants'

13  conduct was particularly unreasonable given the nature and amount of PII obtained and stored and

14  the foreseeable consequences of a data breach on Defendants' systems.

15      167.    Capital One's duty to use reasonable security measures also arose under the GLBA,

16  under which Capital One was required to protect the security, confidentiality, and integrity of

17  customer information by developing a comprehensive written information security program that

18  contains reasonable administrative, technical, and physical safeguards.

19      168.    Defendants' violation of Section 5 of the FTC Act (and similar state statutes)

20  constitutes negligence per se.

21      169.    Capital One's violation of the GLBA and its Safeguards Rule constitutes negligence

22  per se.

23      170.    Class members are consumers within the class of persons Section 5 of the FTC Act

24  (and similar state statutes), and the GLBA, were intended to protect.

25      171.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar

26  state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement

27  actions against businesses which, because of their failure to employ reasonable data security

28

1  measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and

2  class members. The GLBA, with its Safeguards Rule, was similarly intended.

3      172.    As a direct and proximate result of the Capital One Defendants' negligence and the

4  Amazon Defendants' negligence, Plaintiffs and class members have been injured and are entitled

5  to damages in an amount to be proven at trial. Such injuries include one or more of the following:

6  ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse,

7  resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse,

8  resulting in monetary loss and economic harm; loss of the value of their privacy and the

9  confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation

10  expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and

11  unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card

12  statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit

13  scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges

14  for services; lost value of the unauthorized access to their PII permitted by Defendants; the present

15  value of credit monitoring and identity theft protection services necessary to restore Plaintiffs and

16  class members as near as possible to the position they would have been in but for Defendants'

17  wrongful conduct; and other economic and non-economic harm.

18                          **THIRD CAUSE OF ACTION**

19                            **UNJUST ENRICHMENT**

20              Against all Defendants, On Behalf of Plaintiffs and the Class

21      173.    Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

22      174.    Plaintiffs and class members have an interest, both equitable and legal, in the PII

23  about them that was conferred upon, collected by, and maintained by Defendants and that was

24  ultimately stolen in the Data Breach.

25      175.    Defendants were benefitted by the conferral upon them of the PII pertaining to

26  Plaintiffs and class members and by their ability to retain, use, and profit from that information.

27  Defendants understood that they were in fact so benefitted.

28

176.   Defendants also understood and appreciated that the PII pertaining to Plaintiffs and class members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

177.   But for Defendants' willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendants.

178.   Defendants continue to benefit and profit from their retention and use of the PII while its value to Plaintiffs and class members has been diminished.

179.   Capital One also benefitted through its unjust conduct by selling credit card and banking services for more than those services were worth to Plaintiffs and class members, who would not have applied for or used Capital One credit cards at all, or at the terms offered by Capital One, had they been aware that Capital One would fail to protect their PII.

180.   Capital One also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiffs and class members' PII.

181.   It is inequitable for Defendants to retain these benefits.

182.   As a result of Defendants' wrongful conduct as alleged in this Complaint (including, among things, their knowing failure to employ adequate data security measures, their continued maintenance and use of the PII belonging to Plaintiffs and class members without having adequate data security measures, and their other conduct facilitating the theft of that PII), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and class members.

183.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs and class members' PII for profit or cost savings, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

184.   Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiffs and class members in an unfair and unconscionable manner.

1   Defendants' retention of such benefits under circumstances making it inequitable to do so

2   constitutes unjust enrichment.

3       185.    The benefits conferred upon, received, and enjoyed by Defendants were not

4   conferred officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain

5   these benefits.

6       186.    Plaintiffs have no adequate remedy at law.

7       187.    Defendants are therefore liable to Plaintiffs and class members for restitution or

8   disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful

9   conduct, including specifically: the value to Defendants of the PII that was stolen in the Data

10  Breach; the profits or cost savings Defendants are receiving from the use of that information; the

11  amounts that Capital One overcharged Plaintiffs and class members for use of their credit card and

12  banking services; and the amounts that Capital One should have spent to provide reasonable and

13  adequate data security to protect Plaintiffs and class members' PII. In the alternative, Plaintiffs seek

14  nominal damages to the full extent allowed by law.

15                          **FOURTH CAUSE OF ACTION**

16                          **DECLARATORY JUDGMENT**

17                  Against all Defendants, On Behalf of Plaintiffs and the Class

18      188.    Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

19      189.    This Court is authorized to enter a judgment declaring the rights and legal relations

20  of the parties and grant further necessary relief. Furthermore, the Court has broad authority to

21  restrain acts, such as here, that are tortious and violate the terms of the California state statutes

22  described in this Complaint.

23      190.    In order to grant declaratory relief, California courts consider whether there is a

24  proper subject of declaratory relief and whether there is an actual controversy involving justiciable

25  questions relating to the party's rights or obligations. Declaratory relief is appropriate in this

26  instance is appropriate to declare the rights and duties of the parties under the express or implied

27  contracts between Defendants and Plaintiffs, and to enjoin Defendants' ongoing conduct.

28

191. An actual controversy has arisen in the wake of the Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and class members from further data breaches that compromise their PII. Plaintiffs remains at imminent risk that further compromises of their PII will occur in the future.

192. As a result, this Court should enter a judgment declaring, among other things, the following:

        a.    Defendants continue to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;

        b.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

193. The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

194. If an injunction is not issued, Plaintiffs and class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Capital One or Amazon. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

195. The hardship to Plaintiffs and class members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at Capital One or Amazon, Plaintiffs and class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

196.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Capital One or Amazon, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose PII would be further compromised.

## FIFTH CAUSE OF ACTION

## BREACH OF CONFIDENCE

Against the Capital One Defendants, On Behalf of Plaintiffs and the Class

197.     Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

198.     At all times during Plaintiffs and class members' interactions with Capital One, Capital One was fully aware of the confidential and sensitive nature of Plaintiffs' and class members' PII.

199.     As alleged herein and above, Capital One's relationship with Plaintiffs and class members was governed by terms and expectations that Plaintiffs and class members' protected PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

200.     Plaintiffs and class members provided their respective PII to Capital One with the explicit and implicit understandings that Capital One would protect and not permit the PII to be disseminated to the public or any unauthorized parties.

201.     Plaintiffs and class members also provided their respective PII to Capital One with the explicit and implicit understandings that Capital One would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

202.     Capital One voluntarily received in confidence Plaintiffs' and class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

203.     Due to Capital One's failure to prevent, detect, avoid the Data Breach from occurring by following best information security practices to secure Plaintiffs and class members' PII, Plaintiffs' and class members' PII was disclosed and misappropriated to the public and

1    unauthorized third parties beyond Plaintiffs' and class members' confidence, and without their

2    express permission.

3         204.   But for Capital One's disclosure of Plaintiffs' and class members' PII in violation

4    of the parties' understanding of confidence, their PII would not have been compromised, stolen,

5    viewed, accessed, and used by unauthorized third parties. Capital One's Data Breach was the direct

6    and legal cause of the theft of Plaintiffs and class members' PII, as well as the resulting damages.

7         205.   The injury and harm Plaintiffs and class members suffered was the reasonably

8    foreseeable result of Capital One's unauthorized disclosure of Plaintiffs' and class members' PII.

9    Capital One knew its computer systems and technologies for accepting, securing, and storing

10   Plaintiffs and class members' PII had serious security vulnerabilities because Capital One failed to

11   observe even basic information security practices or correct known security vulnerabilities.

12        206.   As a direct and proximate result of Capital One's breaches of confidence, Plaintiffs

13   and class members have been injured and are entitled to damages in an amount to be proven at trial.

14   Such injuries include one or more of the following: ongoing, imminent, certainly impending threat

15   of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm;

16   actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm;

17   loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the

18   compromised PII on the black market; mitigation expenses and time spent on credit monitoring,

19   identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach

20   reviewing bank statements, credit card statements, and credit reports; expenses and time spent

21   initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost

22   benefit of their bargains and overcharges for services; lost value of the unauthorized access to their

23   PII permitted by Defendants; the present value of credit monitoring and identity theft protection

24   services necessary to restore Plaintiffs and class members as near as possible to the position they

25   would have been in but for Defendants' wrongful conduct; and other economic and non-economic

26   harm. In the alternative, Plaintiffs seek nominal damages to the full extent allowed by law.

27

28

## SIXTH CAUSE OF ACTION

## BREACH OF CONTRACT

Against the Capital One Defendants, On Behalf of Plaintiffs and the Class

207.    Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein.

208.    Capital One's Privacy and Opt-Out Notice (the "Notice") is an agreement between Capital One and persons who provided their PII to Capital One, including Plaintiffs and class members.

209.    Capital One's Notice states that it applies to customers, applicants, and former customers of Capital One, and it details how Capital One will both protect and use the PII provided by customers and applicants of Capital One's services.

210.    The Notice provides detailed information about what types of PII will be shared and with what entities. It further promises that to "protect your personal information from unauthorized access and use, we use security measures that comply with federal law."

211.    Plaintiffs and class members on the one hand and Capital One on the other formed a contract when Plaintiffs and class members provided PII to Capital One subject to the Notice.

212.    Plaintiffs and class members fully performed their obligations under the contract with Capital One.

213.    Capital One breached its agreement with Plaintiffs and class members by failing to protect their PII. Specifically, Capital One (1) failed to use reasonable measures to protect that information; (2) failed to use security measures that comply with federal law, including the GLBA, to protect that information; (3) disclosed that information to unauthorized third parties, in violation of the agreement.

214.    As a direct and proximate result of these breaches of contract, Plaintiffs and class members sustained actual losses and damages as described in detail above, including but not limited to that they did not get the benefit of the bargain for which they paid and were overcharged by Capital One for its services; they lost the value of the unauthorized access to their PII permitted by Defendants; and they were damaged in the amount of the present value of credit monitoring and identity theft protection services necessary to restore Plaintiffs and class members as near as

1  possible to the position they would have been in but for Defendants' breaches. Plaintiffs and class

2  members are also entitled to nominal damages, consequential damages, and all other available

3  remedies, because of Capital One's breach.

4  **SEVENTH CAUSE OF ACTION**

5  **BREACH OF IMPLIED CONTRACT**

6  Against the Capital One Defendants, On Behalf of Plaintiffs and the Class

7      215.   Plaintiffs repeat and allege the above Paragraphs as if fully alleged herein, and assert

8  this claim in the alternative to their breach of contract claim to the extent necessary.

9      216.   Plaintiffs and class members also entered into an implied contract with Capital One

10  when they obtained services from Capital One, or otherwise provided PII to Capital One.

11      217.   As part of these transactions, Capital One agreed to safeguard and protect the PII of

12  Plaintiffs and class members.

13      218.   Plaintiffs and class members entered into implied contracts with the reasonable

14  expectation that Capital One's data security practices and policies were reasonable and consistent

15  with industry standards. Plaintiffs and class members believed that Capital One would use part of

16  the monies paid to Capital One under the implied contracts to fund adequate and reasonable data

17  security practices.

18      219.   Plaintiffs and class members would not have provided and entrusted their PII to

19  Capital One or would have paid less for Capital One's services in the absence of the implied contract

20  or implied terms between them and Capital One. The safeguarding of the PII of Plaintiffs and class

21  members was critical to realize the intent of the parties.

22      220.   Plaintiffs and class members fully performed their obligations under the implied

23  contracts with Capital One.

24      221.   Capital One breached its implied contracts with Plaintiffs and class members to

25  protect their PII when it (1) failed to have security protocols and measures in place to protect that

26  information; and (2) disclosed that information to unauthorized third parties.

27      222.   As a direct and proximate result of Capital One's breach of implied contract,

28  Plaintiffs and class members sustained actual losses and damages as described in detail above,

49

CLASS ACTION COMPLAINT

1  including that they did not get the benefit of the bargain for which they paid and were overcharged

2  by Capital One for its services; they lost the value of the unauthorized access to their PII permitted

3  by Defendants; and they were damaged in the amount of the present value of credit monitoring and

4  identity theft protection services necessary to restore Plaintiffs and class members as near as

5  possible to the position they would have been in but for Defendants' breaches. Plaintiffs and class

6  members are also entitled to nominal damages, consequential damages, and all other available

7  remedies, as a result of Capital One's breach.

8  **EIGHTH CAUSE OF ACTION**

9  **CALIFORNIA UNFAIR COMPETITION LAW**

10  Cal. Bus. & Prof. Code §§ 17200, *et seq.*

11  Against All Defendants, On Behalf of Plaintiffs and the Class

12  223.    Plaintiffs, individually and on behalf of the Class, repeat and allege the above

13  Paragraphs, as if fully alleged herein.

14  224.    Defendants are "person[s]" as defined by Cal. Bus. & Prof. Code §17201.

15  225.    Defendants violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging

16  in unlawful, unfair, and deceptive business acts and practices.

17  226.    Defendants' "unfair" acts and practices include:

18      a.    Defendants failed to implement and maintain reasonable security measures

19          to protect Plaintiffs' and class members' PII from unauthorized disclosure,

20          release, data breaches, and theft, which was a direct and proximate cause of

21          the Data Breach. Defendants failed to identify foreseeable security risks,

22          remediate identified security risks, and adequately improve security despite

23          knowing the risk of cybersecurity incidents. This conduct, with little if any

24          utility, is unfair when weighed against the harm to Plaintiffs and the Class,

25          whose PII has been compromised.

26      b.    Defendants' failure to implement and maintain reasonable security

27          measures also was contrary to legislatively-declared public policy that seeks

28          to protect consumers' data and ensure that entities that are trusted with it

use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5.

c. Defendants' failure to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendants' inadequate security, consumers could not have reasonably avoided the harms that Defendants caused.

d. Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82 and Cal. Fin. Code §§ 4050, *et seq.*

227. Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Financial Information Privacy Act, Cal. Fin. Code §§ 4050, et seq., California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, et seq., the FTC Act, 15 U.S.C. § 45, the GLBA, and California common law.

228. Defendants' unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and class members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the GLBA, California's Financial

Information Privacy Act, Cal. Fin. Code §§ 4050, et seq., and California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq., which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs and class members' PII, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII, including duties imposed by the FTC Act, the GLBA, 15 U.S.C. § 45, California's Financial Information Privacy Act, Cal. Fin. Code §§ 4050, et seq., and California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq.;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and class members' PII; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the GLBA, California's Financial Information Privacy Act, Cal. Fin. Code §§ 4050, et seq., and California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq.

229.   Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

230.   As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiffs and class members were injured and lost money or property: the money received by the Capital One for its services; the loss of the benefit of their bargain with and overcharges by Capital One as they would not have paid the Capital One for services or would have paid less for such services but for the violations alleged herein; losses from fraud and identity theft;

1    costs for credit monitoring and identity protection services; time and expenses related to monitoring

2    their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent

3    risk of fraud and identity theft.

4        231.    Defendants acted intentionally, knowingly, and maliciously to violate California's

5    Unfair Competition Law, and recklessly disregarded Plaintiffs' and class members' rights.

6    Defendants are of such a sophisticated and large nature that other data breaches and public

7    information regarding security vulnerabilities put them on notice that their security and privacy

8    protections were inadequate.

9        232.    Plaintiffs and class members seek all monetary and non-monetary relief allowed by

10   law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent

11   business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under

12   California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable

13   relief.

14   <div align="center">**NINTH CAUSE OF ACTION**</div>

15   <div align="center">**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**</div>

16   <div align="center">Cal. Civ. Code §§ 1750, *et seq.*</div>

17   <div align="center">Against All Defendants On Behalf of Plaintiffs and the Class</div>

18       233.    Plaintiffs, individually and on behalf of the Class, repeats and alleges the above

19   Paragraphs, as if fully alleged herein.

20       234.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA") is

21   a comprehensive statutory scheme that is to be liberally construed to protect consumers against

22   unfair and deceptive business practices in connection with the conduct of businesses providing

23   goods, property or services to consumers primarily for personal, family, or household use.

24       235.    Defendants are "person[s]" as defined by Civil Code §§ 1761(c) and 1770, and have

25   provided "services" as defined by Civil Code §§ 1761(b) and 1770.

26       236.    Civil Code section 1770, subdivision (a)(5) prohibits one who is involved in a

27   transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics,

28   ingredients, uses, benefits, or quantities which they do not have."

<div align="center">53</div>
<div align="center">CLASS ACTION COMPLAINT</div>

237.    Civil Code section 1770, subdivision (a)(7) prohibits one who is involved in a transaction from "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."

238.    Plaintiffs and the class members are "consumer[s]" as defined by Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

239.    Defendants' acts and practices were intended to and did result in the sales of services to Plaintiffs and the class members in violation of Civil Code § 1770, including, but not limited to, the following:

  a. Representing that goods or services have characteristics that they do not have;

  b. Representing that goods or services are of a particular standard, quality, or grade when they were not;

  c. Advertising goods or services with intent not to sell them as advertised; and

  d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

240.    Defendants' representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

241.    Had the Defendants disclosed to Plaintiffs and class members that their computer and data storage systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, the Defendants received, maintained, and compiled Plaintiffs and class members' PII as part of the services Defendants provided and for which Plaintiffs and class members paid without advising Plaintiffs and class members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff and class members' PII. Accordingly, Plaintiffs and class members acted reasonably in relying on the Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

242.    As a direct and proximate result of the Defendants' violations of California Civil Code § 1770, Plaintiffs and class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with and overcharges by Capital One, as they would not have paid Capital One for services or would have paid less for such services but for the violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

243.    Plaintiffs and class members seek injunctive relief only and will provide notice of any claim for damages in compliance with California Civil Code § 1782(a).

244.    Plaintiffs and the Class seek all injunctive relief allowed, including but not limited to an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all class members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

a.      For an Order certifying the Class, as defined herein, and appointing Plaintiffs and Plaintiffs' Counsel to represent the Class as alleged herein;

b.      For injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and class members, including but not limited to an order:

    i.      Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.     Requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    Requiring Defendants to delete, destroy and purge the PII of Plaintiffs and class members unless Capital One can provide to the Court reasonable

justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and class members;

iv.   Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff and class members' PII;

v.   Prohibiting Defendants from maintaining Plaintiffs' and class members' PII on the AWS cloud;

vi.   Requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.   Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.   Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.   Requiring Defendants to conduct regular database scanning and securing checks;

xi.   Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon employees' respective responsibilities with handling PII , as well as protecting the PII of Plaintiffs and class members;

xii.     Requiring Defendants to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    Requiring Defendants to implement a system of testing to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs and systems for protecting PII;

xiv.     Requiring Defendants to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor the Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.      Requiring Defendants to meaningfully educate all class members about the threats they face as a result of the loss of their PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.     Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvii.    Appointing a qualified and independent third party assessor to conduct for a period of 10 years a SOC 2 Type 2 attestation to evaluate on an annual basis Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies in compliance with the Court's final judgment.

c.       For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined except that Plaintiffs do not seek damages under the CLRA at this time;

1      d.      For an award of statutory damages, trebled, and punitive or exemplary damages, as

2              allowed by law in an amount to be determined except that Plaintiffs do not seek

3              damages under the CLRA at this time;

4      e.      For an award of injunctive relief (but not damages) under the CLRA;

5      f.      For an award of restitution or disgorgement, in an amount to be determined;

6      g.      For an award of attorneys' fees costs and litigation expenses, as allowable by law;

7      h.      For prejudgment interest on all amounts awarded; and

8      i.      Such other and further relief as this court may deem just and proper.

9                                    **JURY DEMAND**

10         Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby

11   demand a trial by jury on all issues so triable .

12   DATED:  September 17, 2021                 Respectfully submitted,

13

14                                              By: _____

15                                                  David M. Berger

16                                                  *Attorneys for Plaintiffs*

17                                                  Eric H. Gibbs SNB 178658
                                                    David M. Berger SBN 277526
18                                                  Jeffrey Kosbie SBN 305424
                                                    Tayler Walters SBN 335121
19                                                  **GIBBS LAW GROUP LLP**
                                                    505 14th Street, Suite 1110
20                                                  Oakland, California 94612
                                                    Telephone: (510) 350-9700
21                                                  Fax: (510) 350-9701
                                                    ehg@classlawgroup.com
22                                                  dmb@classlawgroup.com
                                                    jbk@classlawgroup.com
23                                                  tlw@classlawgroup.com

24

25

26

27

28

                                          58
                              CLASS ACTION COMPLAINT

## DECLARATION OF PLAINTIFFS' COUNSEL PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)

I, David M. Berger, declare as follows:

1. I am an attorney licensed to practice in this Court and a partner with Gibbs Law Group LLP, counsel for Plaintiffs in this action. I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

2. I submit this declaration on behalf of Plaintiff and in support of Plaintiffs' Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*

3. Plaintiff's Class Action Complaint has been filed in the proper place for trial of this action, which is the Superior Court of California, County of San Alameda. Based on my firm's research and review of publicly available records, venue is proper in this Court because (a) Plaintiff Miranda's injuries occurred in Alameda County; (b) each Defendant conduct substantial business in Alameda County; (c) this is a class action, and the acts and/or omissions complained of took place, in whole or in part, within Alameda County; and (d) a significant number of class members reside in Alameda County.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and that this Declaration was executed this 17th day of September 2021, at Oakland, California.

By: _____

David M. Berger